IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Chrystle M.,[1] | ) | C/A No.: 1:20-2927-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND |
| Andrew M. Saul, | ) | RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court
for a Report and Recommendation ("Report") pursuant to Local Civ. Rule
73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. §
405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the
Commissioner of Social Security ("Commissioner") denying her claim for
Disability Insurance Benefits ("DIB"). The two issues before the court are
whether the Commissioner's findings of fact are supported by substantial
evidence and whether he applied the proper legal standards. For the reasons
that follow, the undersigned recommends the Commissioner's decision be
reversed and remanded for further proceedings as set forth herein.

---

[1] The Committee on Court Administration and Case Management of the
Judicial Conference of the United States has recommended that, due to
significant privacy concerns in social security cases, federal courts should
refer to claimants only by their first names and last initials.

## I. Relevant Background

### A. Procedural History

On January 30, 2019, Plaintiff protectively filed an application for DIB in which she alleged her disability began on January 19, 2016. Tr. at 117, 193–94. Her application was denied initially and upon reconsideration. Tr. at 118–21, 126–29. On March 3, 2020, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Richard LaFata. Tr. at 29–82 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 30, 2020, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 9–28. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on August 12, 2020. [ECF No. 1].

### B. Plaintiff's Background and Medical History

#### 1. Background

Plaintiff was 31 years old at the time of the hearing. Tr. at 45. She completed high school and two years of college. *Id.* Her past relevant work ("PRW") was as warehouse worker, a cashier, a kennel attendant, a retail customer support specialist, and a logistics, shipping and receiving clerk. Tr.

at 71–73. She alleges she has been unable to work since April 1, 2016.[2] Tr. at 42.

### 2.    Medical History

On April 1, 2016, Plaintiff visited Barbara M. McManus, M.D. ("Dr. McManus"), for a neurology consultation as to headaches. Tr. at 733. She reported a history of migraines and recent, persistent, and severe headaches with initial onset four to five weeks prior. *Id.* She described the headaches as presenting initially with a dull pain in her temples, becoming sharp and throbbing, and accompanied by photophobia, phonophobia, nausea, vomiting, and dizziness. *Id.* She rated her headache as a two on a 10-point severity scale during the visit and indicated her headaches sometimes reached a nine. *Id.* Dr. McManus noted Plaintiff had an 11-month-old child and was studying medical coding as a full-time student. Tr. at 733–34. Plaintiff endorsed poor sleep. Tr. at 734. Dr. McManus recorded normal findings on physical and neurological exams. Tr. at 735–36. She referred Plaintiff for magnetic resonance imaging ("MRI") of the brain, prescribed Topirimate, encouraged her to follow up with her sleep doctor, and suggested she take Riboflavin 400 mg and Magnesium 400 mg supplements daily. Tr. at 736.

On April 9, 2016, an MRI of Plaintiff's brain was normal. Tr. at 750–51.

---

[2] Plaintiff amended her alleged onset date during the hearing to account for work performed after her initial alleged onset date. *See* Tr. at 42.

On April 21, 2016, Plaintiff complained of constant frontal headaches that differed from her usual migraines. Tr. at 730. She indicated she was able to sleep, but did not sleep well and continued to feel tired during day. *Id.* Her sleep medicine physician, Fitzgerald E. Drummond, M.D. ("Dr. Drummond"), stated he was uncertain whether Plaintiff's poor sleep was causing or contributing to her headaches, but the two were often linked. Tr. at 733. He ordered a multiple sleep latency test ("MSLT").[3] *Id.*

On June 28, 2016, Plaintiff underwent the MSLT. Tr. at 772. She took five naps over the testing period, with sleep onset at seven-and-a-half minutes, three minutes, four-and-a-half minutes, three-and-a-half minutes, and two minutes. Tr. at 772–73. This resulted in mean sleep latency of 4.1 minutes. Tr. at 773. Dr. Drummond explained the results were consistent with significant objective daytime hypersomnia. *Id.* He indicated Plaintiff appeared to have no onset rapid eye movement ("REM") periods. *Id.* Although he noted at least two sleep onset REM periods were required to support a diagnosis of narcolepsy, he stated Plaintiff's results did not exclude the possibility of narcolepsy. *Id.*

---

[3] "An MSLT is a full-day test consisting of five scheduled naps that test for excessive daytime sleepiness related to narcolepsy or hyposomnia." *Monroe v. Colvin*, 826 F.3d 176, 182 n.6 (4th Cir. 2016) (citing *Sleep Education, Multiple Sleep Latency Test (MSLT)—Overview and Facts*, http://www.sleepeducation.org/disease-detection/multiple-sleep-latency-test/overview -and-facts).

Plaintiff returned to Dr. Drummond to discuss results of an overnight sleep study and the MSLT on September 6, 2016. Tr. at 723. She complained of difficulty maintaining wakefulness. *Id.* Dr. Drummond assessed idiopathic hypersomnia based on the MSLT findings. Tr. at 726. He discussed other tests that might provide a more definitive diagnosis, but informed Plaintiff that their results would not change his management recommendations. *Id.* He prescribed Modafinil and instructed Plaintiff not to drive or operate dangerous equipment if she was sleepy. *Id.*

Plaintiff presented to Derek J. Feussner, M.D. ("Dr. Feussner"), for a gastroenterology consultation on November 4, 2016. Tr. at 719. She reported B12 and iron deficiencies and complained of issues with food "running through her," such that she would have a bowel movement within an hour of eating. *Id.* She complained of constipation and hemorrhoids since starting B12 injections. *Id.* Dr. Feussner recorded normal findings on physical exam. Tr. at 720. He ordered an esophagogastroduodenoscopy ("EGD") with biopsies of Plaintiff's duodenum and stomach. *Id.*

On January 11, 2017, Plaintiff presented to the physical therapy department and requested a lumbar corset. Tr. at 714. She indicated she needed support to carry her 20-month-old child up and down stairs. *Id.* Physical therapist Rory Lynn Sarkees fitted Plaintiff with a small brace. *Id.*

Plaintiff also presented for a cardiology consultation for palpitations on January 11, 2017. Tr. at 715. She endorsed a one-year history of palpitations that occurred at random at both rest and activity and lasted for 10 to 30 seconds. *Id.* Nurse Practitioner Amber N. Ward ("NP Ward") recorded normal findings on physical exam and electrocardiogram ("EKG"). Tr. at 717. She increased Propranolol to 120 mg, ordered a cardiac MRI, and referred Plaintiff for an evaluation for supraventricular tachycardia ("SVT"). *Id.*

On February 2, 2017, Plaintiff presented to Kimberly S. Bowers, M.D. ("Dr. Bowers"), for a mental health consultation. Tr. at 706. She complained of a persistent depressive disorder and worsening anxiety. Tr. at 707. She indicated she felt anxious and uncomfortable around strangers and in public. *Id.* She endorsed social anxiety, noting she did not want to disappoint others and feared people were talking about her. *Id.* She described panic symptoms, such as feeling shaky, short of breath, and as if the room were closing in. *Id.* She reported irritability, verbal outbursts, and loss of interest in some activities. *Id.* She stated her health issues, her son's health issues, and her finances caused increased stress. *Id.* Dr. Bowers observed Plaintiff to have an anxious mood, to fidget with her hands, to have fair insight, and to otherwise demonstrate normal mental status. Tr. at 711. She assessed generalized anxiety disorder ("GAD") with panic, social anxiety disorder, and unspecified depression. Tr. at 712. She prescribed Buspirone 5 mg three times a day for

anxiety. *Id.* She warned Plaintiff about a potential interaction with Amitriptyline and contacted the neurology department to inform her provider of her desire to discontinue Amitriptyline. *Id.* She recommended cognitive behavioral therapy ("CBT"), but Plaintiff declined a referral. *Id.*

Plaintiff presented to John Lacy Sturdivant, M.D. ("Dr. Sturdivant"), for a cardiology consultation on February 17, 2017. Tr. at 704. She reported a six-year history of intermittent palpitations associated with nausea, presyncope, and diminished hearing. *Id.* She indicated her symptoms had decreased from once or twice a day to two to three times per week since starting Carvedilol. *Id.* She described episodes lasting from 30 seconds to two minutes, and Dr. Sturdivant noted an event monitor had recovered short runs of narrow complex SVT up to 15 beats at maximal heart rate of 150 beats per minute ("BPM") in December 2016. *Id.* He recorded normal findings on physical exam. Tr. at 705–06. He recommended Plaintiff wean off Propranolol and start therapy with Verapamil. Tr. at 706. He indicated Plaintiff could reinitiate Propranolol if Verapamil worsened her migraines or failed to improve her symptoms and could consider adding Propafenone in the future, if necessary. *Id.*

On April 9, 2017, Plaintiff underwent an MRI of the lumbar spine that showed a stable L5–S1 posterior annular fissure/tear and mild facet

hypertrophy causing mild left lateral recess and mild left neural foraminal narrowing at this level. Tr. at 747–48.

Plaintiff presented to nurse practitioner Holly Gardner ("NP Gardner"),for a neurosurgery consultation on June 20, 2017. Tr. at 703. She complained of worsening back and bilateral leg pain. *Id.* NP Gardner noted full strength in Plaintiff's bilateral lower extremities. Tr. at 704. She explained to Plaintiff that she had an annular tear and recommended nonoperative treatment. *Id.* She referred Plaintiff for injections to address her pain. *Id.*

Plaintiff received a Botox injection for migraine therapy on July 7, 2017. Tr. at 702.

On July 10, 2017, Plaintiff presented to Dale R. Tabor, M.D., Ph. D. ("Dr. Tabor"), for a pain consultation. Tr. at 698. She complained of bilateral lower back pain with burning in her lower extremities. *Id.* She indicated her sleep was sometimes interrupted by pain. *Id.* She stated she was a "stay at home mom" and had stopped attending school because her pain prevented her from concentrating. *Id.* She denied relief from Meloxicam. *Id.* Dr. Tabor noted he had previously treated Plaintiff with injections in 2013 that had provided minimal relief. *Id.* He recorded normal findings on physical exam, aside from pain on moderate palpation over the lumbar spinous processes, diminished deep tendon reflexes, 4/5 bilateral lower extremity strength, and

limited flexion, extension, and lateral flexion of the lumbar spine. Tr. at 701. He assessed lumbar spondylosis and advised Plaintiff of treatment options. *Id.* He noted Plaintiff was "of highly anxious nature" and felt that her anxiety "contribute[d] to her pain issues." *Id.* He instructed Plaintiff to discontinue Meloxicam and prescribed Diclofenac. *Id.* He noted Plaintiff had "very unremarkable lumbar imaging and phys[ical] exam" and no progression from a prior MRI in 2015. *Id.* He indicated Plaintiff's rating of her pain as a three was more consistent with discomfort than pain. Tr. at 701, 702.

Plaintiff presented to Cristian M. Thomae ("Dr. Thomae") for a gynecological consultation on August 16, 2017. Tr. at 695. She complained of dyspareunia, urinary frequency, painful urination, and inflammatory changes on pap smear. *Id.* Dr. Thomae ordered lab studies and a pelvic ultrasound and prescribed a ten-day course of Doxycycline 100 mg. Tr. at 697.

On August 19, 2017, a pelvic ultrasound showed a hyperechoic structure abutting the inferior aspect of the endometrium, measuring up to 2.1 cm with slightly increased flow that might represent a fibroid. Tr. at 744–45.

Plaintiff consulted with Faith Brown, Pharm. D. ("Dr. Brown"), as to titration of Mirtazapine on August 30, 2017. Tr. at 691. She indicated she had recently discontinued all medications, as she feared they might exacerbate atrial tachycardia. *Id.* She reported having taken Mirtazapine for a month in

2013 with no significant improvement. Tr. at 693. Dr. Brown indicated Plaintiff should consider starting a low dose of Mirtazapine 7.5 mg and titrating it to 15 mg. *Id.* She also noted Plaintiff should consider a trial of Hydroxyzine for anxiety and sleep. *Id.* She recommended Plaintiff consider augmenting her therapy with a selective serotonin reuptake inhibitor ("SSRI") and Quetiapine. Tr. at 694. She noted that Meloxicam should be removed from Plaintiff's medication list, as she had subsequently been prescribed Diclofenac. *Id.*

X-rays of Plaintiff's right shoulder were normal on September 8, 2017. Tr. at 744.

Plaintiff followed up with Dr. Thomae on September 14, 2017. Tr. at 637. Dr. Thomae noted an ultrasound showed an intrauterine mass than required additional imaging. *Id.* He indicated he would schedule Plaintiff for saline infusion sonohysterography ("SIS"). *Id.*

On October 10, 2017, Dr. Thomae performed SIS that confirmed the presence of an endometrial polyp and dyspareunia. Tr. at 628. He planned to schedule Plaintiff for a hysteroscopy polypectomy and laparoscopy. *Id.*

Plaintiff presented to nurse practitioner Stephen Lesieur ("NP Lesieur") as a new mental health patient on October 12, 2017. Tr. at 624. She endorsed a history of depression, anxiety, weight loss, insomnia, depressed mood, stress-induced anorexia, anhedonia, dyspareunia, and suspicion of

others in her home. *Id.* She indicated she felt as if her memory was "not working right." *Id.* She described an unsupportive home environment. *Id.* NP Lesieur recommended ways to decrease stress and suggested therapy, but Plaintiff was reluctant to participate, as she would have to arrange childcare. *Id.* She rated her mood as a five and indicated she slept for four to five hours per night. Tr. at 625. NP Lesieur noted Plaintiff was alert and oriented times four; in no apparent distress; had normal gross and fine motor movements; had blunted affect with constricted range and congruent mood; reported stable, depressed mood; had preoccupied thoughts; showed no evidence of hallucinations, delusions, depersonalization, derealization, or perceptual disturbances; had fair concentration; had somewhat diminished short- and long-term memory based on interview; had good attention to hygiene; demonstrated normal speech; had fair eye contact; had a cooperative attitude; demonstrated normal intelligence and cognition; had good insight and judgment; and denied suicidal and homicidal thoughts. Tr. at 626. He suggested a referral for chronic fatigue and instructed Plaintiff to continue her mental health medications. Tr. at 627.

Plaintiff presented for a sleep apnea consultation on October 31, 2017. Tr. at 605. She endorsed excessive daytime sleepiness, despite sleeping for the full night. *Id.* She indicated she was no longer taking Provigil because she had developed SVT in response to it. *Id.* She complained of increased daytime

sleepiness and denied palpitations and heart racing. *Id.* Dr. Drummond assessed hypersomnia with increased daytime symptoms. Tr. at 610. He recommended a lower dose of Provigil 100 mg, as Plaintiff had been off the medication for several years and had not experienced palpitations or heart racing over that period. *Id.*

On November 7, 2017, Plaintiff reported she "threw her back out again while picking up her 30 pound son and after lifting a case of water." Tr. at 600. She described pain in her lower back that radiated to her buttocks and down both sides of her leg. *Id.* Rhonda Lucas, R.N., observed Plaintiff to ambulate to the triage room with a slight limp. *Id.* She discussed the matter with Plaintiff's primary care physician Suzann H. Weathers, M.D. ("Dr. Weathers"), who instructed Plaintiff to continue to take Diclofenac and Cyclobenzaprine as prescribed, apply heat to her back, rest, and avoid lifting for two weeks. *Id.*

On November 8, 2017, Dr. Thomae performed laparoscopic excision of endometriosis hysteroscopy dilation and curettage. Tr. at 643–48. He discharged Plaintiff with instructions to avoid lifting greater than 15 pounds for two weeks, pelvic rest for two weeks, and no driving while taking narcotic pain medication. Tr. at 577.

On November 14, 2017, Plaintiff rated her mood as a four and indicated she was sleeping for four to five hours per night,[4] had financial struggles, and was feeling more anxious. Tr. at 569. She denied taking Topiramate due to tingling in her feet and weight gain and Oxycodone due to nausea. *Id.* NP Lesieur noted normal findings on mental status exam ("MSE"), aside from blunted affect with constricted range and congruent mood, preoccupied thoughts, fair concentration, somewhat diminished short- and long-term memory based on interview, and fair eye contact. Tr. at 571–72. Plaintiff requested to discontinue Buspirone, as she found it ineffective. Tr. at 572. NP Lesieur instructed Plaintiff to continue her other medications. *Id.*

Plaintiff presented to Alison W. Martin, Pharm. D. ("Dr. Martin"), with concerns over side effects from Topiramate on December 14, 2017. Tr. at 560. She complained of tingling and itchiness on the bottom of her feet, mental fogginess, increased pressure in her knee joints, and increased difficulty interacting with others. *Id.* She reported the symptoms had resolved when she stopped Topiramate, returned when she restarted it, and resolved when she discontinued it a second time. *Id.* She indicated she was treating her headaches and migraines with Sumatriptan 50 mg as needed, magnesium 500 mg daily, Diclofenac 40 mg twice a day, and three Advil migraine tablets

---

[4] The same note also indicates Plaintiff had recently started Modafinil, was sleeping seven to eight hours, and did not take naps. *See* Tr. at 569.

daily. Tr. at 561. Dr. Martin expressed concern over Plaintiff's overutilization of abortive treatment and her use of two nonsteroidal anti-inflammatory drugs ("NSAIDs"). Tr. at 563. She encouraged Plaintiff to discontinue use of Advil and to reduced Sumatriptan to two to three times a week to reduce the risk of medication overuse/rebound headaches. *Id.* She indicated Plaintiff might benefit from Zonisamide for headache prevention, and Plaintiff agreed to proceed with a trial. *Id.* She instructed Plaintiff to start Zonisamide 25 mg at night for two weeks and to titrate up to 50 mg at night, if tolerated. *Id.*

Plaintiff also followed up with NP Lesieur on December 14, 2017. Tr. at 564. She rated her mood as a three. *Id.* She indicated Modafinil helped with energy such that she was sleeping seven to eight hours and did not take naps. *Id.* NP Lesieur observed Plaintiff to have a blunted affect with constricted range and congruent mood, preoccupied thoughts, fair concentration, diminished memory, fair eye contact, and otherwise normal mental status. Tr. at 566–67. He prescribed Pramipexole 1.125 mg nightly for restless leg syndrome, Ducusate 100 mg daily, and Mirtazapine 22.5 mg. Tr. at 567.

Plaintiff followed up in the neurology clinic for headaches on January 12, 2018. Tr. at 546. She reported unchanged frequency of headaches and symptoms and indicated she had not yet titrated up her dose of Zonisamide. Tr. at 547. She reported taking Advil migraine, Tylenol, and Sumatriptan. *Id.* Shaun B. Ajinkya, M.D. ("Dr. Ajinkya"), recorded normal findings on physical

14

exam. Tr. at 551. He refilled Sumatriptan, instructed Plaintiff to take Zonisamide 50 mg at bedtime, referred her for CBT, and indicated she could try chocolate containing more than 70% Cacao. Tr. at 552.

On January 18, 2018, Dr. Thomae noted Plaintiff continued to experience dyspareunia, despite use of an NSAID. Tr. at 545. He indicated a plan to treat Plaintiff with Zoladex injections for six months, but noted that if it was unsuccessful, he would proceed with laparoscopic-assisted vaginal hysterectomy ("LAVH"). *Id.*

On January 23, 2018, Plaintiff rated her mood as a four and indicated she was sleeping seven to eight hours and not taking naps. Tr. at 537. NP Lesieur observed Plaintiff to have blunted affect with constricted range and congruent mood, preoccupied thoughts, somewhat diminished memory, fair concentration and eye contact, and otherwise normal mental status findings. Tr. at 539.

Plaintiff presented to Dr. Feussner for gastroenterology follow up on February 1, 2018. Tr. at 534. She reported occasional diarrhea and associated lower abdominal cramping with Miralax. *Id.* She complained of some difficulty with complete defecation. *Id.* Dr. Feussner recorded normal findings on exam. Tr. at 535–36. He referred Plaintiff to the Medical University of South Carolina for ano-rectal manometry and suspected it would show dyssynergic defecation for which she would need to meet with a physical

therapist for biofeedback therapy. Tr. at 536. He instructed Plaintiff to continue Ducosate. *Id.*

On February 6, 2018, Navdeep K. Dhaliwal, M.D. ("Dr. Dhaliwal"), completed a disability benefits questionnaire as a follow up to a compensation and pension ("C&P") exam. Tr. at 518. He noted Plaintiff had a mental diagnosis of major depressive disorder ("MDD") and medical diagnoses that included iron-deficiency anemia, vitamin B12 deficiency, atrial tachycardia, migraines, endometriosis, and chronic hypertension. *Id.* He indicated Plaintiff had occupational and social impairment with reduced reliability and productivity. Tr. at 519. He reviewed NP Lesieur's January 29 treatment note, as well as other mental health treatment records. Tr. at 519–23, 526. During an interview, Plaintiff reported living with her fiancée, their three-year-old son, and her fiancée's mother and father. Tr. at 523. She denied working and indicated she provided full-time care to her son. *Id.* She stated she stayed home most of the time and had no social contacts outside of her household. *Id.* She reported having a driver's license and driving without difficulty. *Id.* She endorsed abilities to perform activities of daily living ("ADLs") independently and to manage finances. *Id.* Plaintiff reported depressed mood, low energy, anhedonia, amotivation, and said she would not get out of bed if it were not for her son. Tr. at 524. She endorsed feeling tense and on edge, having panic attacks at least once a week, fearing others were

talking about her, being hypervigilant, having an irritable mood, having angry verbal outbursts with her fiancée and his mother, and having paranoia. *Id.* Dr. Dhaliwal noted Plaintiff's symptoms included: depressed mood; anxiety; suspiciousness; panic attacks more than once a week; chronic sleep impairment; flattened affect; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships; difficulty in adapting to stressful circumstances, including work or a work-like setting; and inability to establish and maintain effective relationships. *Id.* He recorded normal findings on MSE, aside from blunted affect. Tr. at 525. Plaintiff obtained a score of 21 on the patient health questionnaire 9 ("PHQ-9"), suggesting severe depression. *Id.*

Nurse Practitioner Kristy C. Anderson ("NP Anderson") also completed a headache disability benefits questionnaire in conjunction with a C&P exam on February 6, 2018. Tr. at 527. She noted Plaintiff had been diagnosed with migraine, including migraine variants. Tr. at 528. She noted Plaintiff endorsed daily headaches and migraines occurring three to four times a week that were accompanied by nausea, intermittent vomiting, and sensitivity to light and sound. *Id.* She indicated Plaintiff took Sumatriptan and Advil and had previously tried Elavil, magnesium, Valproate, Verapamil, and Propranolol. *Id.* She stated Plaintiff had undergone a computed tomography ("CT") scan and an MRI of the brain in 2016 that showed no acute

17

abnormalities. Tr. at 529. NP Anderson checked "[n]o" in response to a question as to whether Plaintiff's headache condition impacted her ability to work. *Id.* She noted normal exam findings. *Id.*

Plaintiff presented to nurse practitioner Marcelaine Haire ("NP Haire") for an initial pain management visit on February 9, 2018. Tr. at 515. She endorsed chronic daily headaches, migraines three to four times a week, low back pain since 2011, pelvic pain over the prior six to eight months with recently-diagnosed endometriosis, depression, and anxiety. *Id.* She indicated she had attempted exercise, but it aggravated her back. *Id.* She noted she had been approved for aqua therapy, but had not attended. *Id.* She indicated she woke in the morning feeling exhausted and had recently started Provigil. *Id.* She rated her pain as a five and noted it was usually a three. *Id.* NP Haire noted: tenderness to palpation to the lower paraspinal muscles; ambulates without difficulty; full lumbar ROM with some discomfort at end of ROM in flexion; euthymic mood and appropriate affect; and no neurological deficits on gross exam. Tr. at 516. Her impressions were chronic back pain, hypersomnolence, depression/anxiety, endometriosis, migraine headaches, and vitamin D deficiency. *Id.* She prescribed Theracane and instructed Plaintiff to stretch and walk 15 to 20 minutes daily and decrease her dietary sugar and processed carbohydrate consumption. Tr. at 517.

On February 28, 2018, NP Lesieur recorded findings on MSE that were comparable to his prior exams. Tr. at 507. Plaintiff scored 23 points on a PHQ-9 screening, which was consistent with severe depression. Tr. at 508. NP Lesieur instructed Plaintiff to continue supportive therapy, psychopharmacology, and case management services. *Id.*

On March 20, 2018, Plaintiff reported Provigil 100 mg had been ineffective. Tr. at 493. She endorsed ongoing difficulty with hypersomnia and episodes of intrusive sleep. *Id.* Dr. Drummond assessed idiopathic hypersomnia with daily symptoms of hypersomnia and intrusive sleep. Tr. at 497. He prescribed Armodafinil 250 mg and instructed Plaintiff to follow up in six months. *Id.*

Dr. Drummond wrote a letter addressing Plaintiff's idiopathic hypersomnia on April 13, 2018. Tr. at 491–92. He stated Plaintiff experienced intrusive sleep daily. Tr. at 492. He noted Plaintiff had undergone an overnight sleep test in 2011 that showed a short sleep latency, short REM latency, and high sleep efficiency. *Id.* He stated Plaintiff subsequently underwent MSLT in 2016 that confirmed a severe degree of objective hypersomnia with a mean sleep latency of 4.1 minutes. *Id.* He indicated Plaintiff had "intrusive sleep events at least once a day and 'never had a day without it.'" *Id.*

Plaintiff followed up with NP Haire for pain reassessment on March 30, 2018. Tr. at 486. She reported chronic headaches and pelvic pain remained about the same, but bilateral knee pain had worsened due to increased stair climbing. *Id.* She indicated she had discontinued Theracane after having used it for a few weeks without improvement. *Id.* NP Haire noted Plaintiff had full ROM of the knees, was grossly neurologically intact, ambulated without difficulty, and was tender to palpation in her lower paraspinal muscles. Tr. at 489. She advised Plaintiff to restart Theracane, stretch daily, walk for 15 to 20 minutes, and decrease dietary sugar and processed carbohydrates. *Id.* She noted Plaintiff did not desire to participate in physical or aquatic therapy. *Id.*

On April 5, 2018, NP Lesieur processed with Plaintiff that endometriosis might account for many of her symptoms. Tr. at 481. Plaintiff indicated she was sleeping for seven to eight hours and was not taking naps. Tr. at 481–82. She complained of increased stress and conflicts in the home. Tr. at 482. She said she felt anxiety related to her son's medical problems and was reluctant to leave him with her fiancée's mother for long, even though she trusted her. *Id.* NP Lesieur discussed a possible diagnosis of borderline personality disorder, as Plaintiff endorsed most symptoms, aside from dissociative symptoms. *Id.* He noted Plaintiff had recently discontinued Buspirone with no noticeable change in anxiety and had been taking Mirtazapine 45 mg instead of 22.5 mg, as prescribed. *Id.* Plaintiff agreed to

add Duloxetine 20 mg daily for mood and pain. *Id.* She indicated she had recently started Modafinil, which helped with energy. *Id.* NP Lesieur recommended Plaintiff consider referrals for chronic fatigue and individual therapy to address catastrophizing. *Id.* He recorded normal findings on MSE, aside from blunted affect with constricted range and congruent mood, preoccupied thoughts, fair concentration and eye contact, and somewhat diminished memory. Tr. at 484.

Plaintiff presented to neurologist Adam Greenblatt ("Dr. Greenblatt") on April 26, 2018. Tr. at 472. She denied side effects from Zonegran 50 mg, but endorsed no clinical benefit. *Id.* She described sharp pain in her right temple that eventually wrapped around her head, lasted two to six hours, and was associated with nausea, vomiting, and sensitivity to smell, taste, light, and sound. *Id.* She indicated she experienced migraines three to four times a week and used Sumatriptan two to three times a week to prevent vomiting. *Id.* She endorsed chronic daily headaches she rated as a two to four on the pain scale and indicated her migraines were superimposed on the headaches. *Id.* She stated she slept for seven to 10 hours at night, but continued to feel sleepy. Tr. at 473. She reported anxiety and depression. *Id.* Dr. Greenblatt recorded normal findings on exam. Tr. at 477. He stopped Zonegran and prescribed Riboflavin 200 mg twice a day. Tr. at 477–78. He

referred Plaintiff to mental health for CBT to combat chronic medically-refractory pain. Tr. at 478.

Plaintiff returned to Dr. Thomae for pelvic pain on May 8, 2018. Tr. at 459. Dr. Thomae stated Plaintiff continued to experience dyspareunia and neither Provera nor Zoladex had resolved her pain. *Id.* He noted Plaintiff was scheduled for LAVH with bilateral salpingectomy and recommended leaving her ovaries if they did not show evidence of endometriosis. *Id.*

Also on May 8, 2018, Plaintiff complained that many of her medical providers were dismissive or acted as if she were exaggerating her symptoms. *Id.* She indicated she was sleeping for seven to eight hours at night and denied taking naps during the day. *Id.* NP Lesieur recorded MSE findings consistent with prior exams. Tr. at 457–58. He advised Plaintiff to continue her medications and to consider a referral for chronic fatigue. Tr. at 458.

Plaintiff also followed up with Dr. Drummond on May 8, 2018. Tr. at 450. She reported being under a lot of stress and feeling uncertain as to whether Armodafinil was helpful, as she remained symptomatic and was not sleeping well. *Id.* She denied side effects. *Id.* Dr. Drummond instructed Plaintiff to continue Armodafinil and to return in a year, unless she had problems. Tr. at 454.

Plaintiff returned to Dr. Feussner for gastroenterology follow up on May 24, 2018. Tr. at 447. She endorsed constipation and indicated she was

having one bowel movement per day with use of a stool softener. *Id.* She endorsed a sudden need to defecate without warning, which Dr. Feussner noted to be verified by her grossly abnormal anorectal manometry study that showed a high urge to defecate sensory threshold. Tr. at 448. She noted abdominal pain that was likely related to endometriosis, as she had received modest benefit from hormone injection therapy and was scheduled to undergo hysterectomy. *Id.* Dr. Feussner suspected Plaintiff had slow transit constipation in a setting of high urge to defecate sensory threshold. Tr. at 449. He instructed Plaintiff to continue Ducosate and to proceed with hysterectomy. *Id.*

Plaintiff underwent LAVH and bilateral salpingectomy on May 30, 2018. Tr. at 638–40.

On June 12, 2018, Plaintiff presented to NP Lesieur for mental health follow up. Tr. at 411. NP Lesieur stated Plaintiff had adjusted well following hysterectomy. *Id.* He noted MSE findings that were consistent with prior exams. Tr. at 414. Plaintiff's score of 20 on the PHQ-9 screen suggested severe depression. Tr. at 414–15.

Plaintiff presented to Dr. Weathers for primary care follow up on July 11, 2018. Tr. at 402. She reported migraines that occurred twice a week, chronic low back pain, and anxiety. *Id.* She noted she was taking a stimulant for idiopathic hypersomnia. *Id.* She complained of daily episodes of chest

tightness and heart racing. *Id.* She endorsed constipation and cramping associated with gastrointestinal problems. *Id.* Dr. Weathers recorded normal findings on exam. Tr. at 404. She assessed chronic headaches, idiopathic hypersomnia, atrial tachycardia/palpitations, chronic low back pain, constipation/diarrhea, vitamin deficiencies, iron deficiency, and anxiety. *Id.* She prescribed vitamin D and ordered two additional months of iron infusions. *Id.* She wrote the following:

> I reviewed her chart, specialist rec[ord]s, and all of the medication changes she had had this past year. I am not surprised she feels exhausted and as poorly as she does. She has been through more medication changes/adjustments than I can keep up with and has been on either ocp/depo/zoladex for a year and then had a hysterectomy. I explained that her body has been through a lot of hormonal, medical, and chemical changes and needs time to adjust. I asked her to please try to limit medication changes to a minimum over the next few months to allow her body to reach some sort of homeostasis.

Tr. at 405.

On July 17, 2018, Plaintiff reported many of her symptoms had improved. Tr. at 396. NP Lesieur noted normal findings on MSE, aside from blunted and constricted mood and affect, preoccupied thoughts, fair eye contact and concentration, somewhat diminished recent and remote memory, and depressed, but stable mood. Tr. at 399. Plaintiff agreed to continue her medications and to additional titration of Duloxetine. *Id.*

Plaintiff presented to Sallie M. McSwain, M.D. ("Dr. McSwain"), for a post-operative visit on July 26, 2018. Tr. at 392. She reported she had been doing well and her chronic pelvic pain had improved. *Id.* She denied bowel problems and indicated only mild urinary frequency. *Id.* She noted she was "ambulating and chasing [her] child without issues." *Id.* Dr. McSwain indicated Plaintiff's incisions were healing well and her abdomen was soft, non-tender, and non-distended. Tr. at 393. She released Plaintiff to return to primary care and indicated it was okay for her to resume normal activities and work. Tr. at 394.

Plaintiff presented to Dr. Greenblatt for migraine follow up on July 27, 2018. Tr. at 383. She described migraines that occurred three to four times a week, lasted two to four hours, and were associated with nausea and vomiting. *Id.* She noted she tried to sleep through her migraines. *Id.* She stated her headaches had been about the same since reducing Zonisamide from 100 to 50 mg. *Id.* She reported taking Sumatriptan nine times per month and indicated it was effective, but "knock[ed her] out." Tr. at 384. She noted she had been unable to take B12 or to care for her own needs and acquire sufficient sleep at times due to providing care for her son. *Id.* Dr. Greenblatt recorded normal findings on exam. Tr. at 389. He stopped Zonisamide due to limited efficacy, continued Riboflavin 200 mg twice a day

and magnesium oxide 420 mg daily, and recommended a trial of Enzyme CoQ10 100 mg three times a day. *Id.*

On August 10, 2018, a cardiac event monitor report showed mostly sinus rhythm with heart rate ranging from 52 to 185 BPM and averaging 89 BPM. Tr. at 381. Plaintiff experienced one event of SVT, isolated ectopy/premature ventricular contractions ("PVCs"), and 11 patient-triggered events correlated with sinus rhythm, sinus tachycardia, and isolated ectopy over the monitoring period of six days, 19 hours. *Id.*

Plaintiff presented to Dr. Payne for cardiology follow up on August 21, 2018. Tr. at 361. She complained of palpitations, and an event monitor had confirmed SVT. *Id.* She endorsed a daily sensation of racing heart and feeling as if she had just finished running. *Id.* She indicated the events could last for one to ten minutes. *Id.* She endorsed occasional chest tightness. *Id.* She described an episode of pre-syncope seven months prior when her vision "went dark," she felt dazed, and sustained a fall. *Id.* Dr. Payne recorded normal findings on exam. Tr. at 364–65. He recommended low-dose Atenolol for symptomatic SVT. Tr. at 365.

On August 22, 2018, Plaintiff endorsed increased stress and chaos in her household. Tr. at 357. NP Lesieur noted normal findings on MSE, aside from blunted and constricted mood and affect, preoccupied thoughts, fair concentration and eye contact, somewhat diminished short- and long-term

memory, and depressed, but stable mood. Tr. at 359. Plaintiff agreed to additional titration of Duloxetine. Tr. at 360.

Plaintiff presented to Layne A. Goble, Ph. D. ("Dr. Goble"), for a pain psychosocial assessment on September 17, 2018. Tr. at 346. She reported a long history of migraine headaches that had become more frequent over the prior three years. Tr. at 347. She endorsed constant head pain and three to four migraines per week, lasting two to three hours at a time. *Id.* She complained of pain in her pelvis, bilateral knees, upper thoracic spine, and low back radiating to her right leg. *Id.* She also had a history of endometriosis, lumbar spondylosis, vitamin D deficiency, idiopathic hypersomnia, anemia, SVT, amenorrhea, hearing loss, elevated blood pressure, MDD, and undefined anxiety disorder. *Id.* Dr. Goble observed pain behaviors that included slower gait and shifting in her seat at times. *Id.* Plaintiff rated her current pain as a four, indicating it ranged from a three to a seven. *Id.* She denied relief from pain treatment or medication over the prior 24-hour period. *Id.* On a brief pain index, Plaintiff indicated high levels of pain interference with general activity, mood, walking ability, normal work, relations with people, and enjoyment of life and a moderate level of pain interference with sleep. *Id.* She described her pain as throbbing, shooting, stabbing, sharp, cramping, aching, and splitting. *Id.* She described associated emotions as tiring/exhausting, sickening, fearful, and

punishing/cruel. *Id.* She noted her headaches were associated with dizziness, nausea, and passing out. *Id.* She described muscles clenching in her chest and a vibration sensation in her right foot over the prior week. *Id.* Plaintiff reported being able to fall asleep and stay asleep, but noted chronic fatigue and hypersomnia throughout the day, despite taking Nuvigil. Tr. at 348. She denied taking daytime naps, as she had to care for her son. *Id.* She endorsed difficulty bending forward and backward, twisting and turning from side-to-side, picking up heavier objects, and using stairs. *Id.* She indicated she experienced some conflict with her fiancée and his mother, with whom they lived. *Id.* She said she had few friends in the area and felt impatient with others, irritable, sad/depressed, and anxious. *Id.* She endorsed difficulty with concentration due to poor sleep and discomfort. *Id.*

Dr. Goble recorded normal findings on MSE, aside from "irritable" mood, depressed affect, somatically-focused thought content, and fair judgment and insight. Tr. at 349–50. His clinical impressions were somatic symptoms disorder, predominantly pain, persistent; MDD, recurrent; hypersomnolence disorder; rule out posttraumatic stress disorder ("PTSD"); and rule out panic disorder. Tr. at 350. Plaintiff expressed interest in re-engaging evidence-based treatment, but indicated it would be difficult for her to find childcare. *Id.* She planned to follow up for CBT. *Id.*

Plaintiff followed up with NP Lesieur on October 18, 2018. Tr. at 336. She described her mood as depressed, but stable. Tr. at 339. NP Lesieur noted mostly normal findings on MSE, except that Plaintiff had blunted and restricted mood and affect, preoccupied thoughts, fair concentration and eye contact, and somewhat diminished short- and long-term memory. *Id.* Plaintiff declined an addition of Gabapentin for neuropathic pain, noting she had previously experienced severe nausea when she restarted it. Tr. at 340.

On November 28, 2018, NP Lesieur noted normal findings on MSE, aside from blunted and constricted mood and affect, preoccupied thoughts, fair concentration, somewhat diminished short- and long-term memory, and depressed, but stable mood. Tr. at 326. He indicated Plaintiff should consider a trial of Pregabalin for pain. *Id.*

The interdisciplinary pain team discharged Plaintiff on November 30, 2018, after she had failed to attend a recently-scheduled appointment. Tr. at 322.

Plaintiff presented to Matthew Rolfsen, M.D. ("Dr. Rolfsen"), for gastroenterology follow up on January 17, 2019. Tr. at 305. She reported little change in her abdominal pain since her hysterectomy. *Id.* She described intermittent, crampy abdominal pain associated with bowel movements. *Id.* She indicated she often alternated between constipation and diarrhea. *Id.* She reported her symptoms were worsened by anxiety, but that she had

learned to live with them. *Id.* Dr. Rolfsen recorded normal findings on exam. Tr. at 307. He recommended Plaintiff use IBGuard for irritable bowel syndrome ("IBS") symptoms, increase her water intake and exercise frequently to improve regularity, and consider a squatty potty. Tr. at 308.

On January 22, 2019, NP Lesieur recorded finding on MSE consistent with prior exams. Tr. at 304. He assessed MDD and advised Plaintiff to continue supportive therapy, psychopharmacology, and case management services. *Id.*

Plaintiff visited Dr. Greenblatt for neurology follow up on January 25, 2019. Tr. at 291. She reported she had undergone a pain clinic assessment and had begun CBT, but was unable to follow up due to her need to care for her son, who had an immune disorder and required constant treatment. *Id.* She described her headaches as about the same in intensity and frequency, with daily headaches and migraines three to four times a week. *Id.* She reported sleeping for 10 hours per night, but feeling defeated. *Id.* She said she had minimal support with her son, as she rarely saw her mother-in-law and her husband worked a laborious job from 8:00 AM to 5:00 PM. *Id.* Dr. Greenblatt noted Plaintiff had failed Topirimate and had not had time to titrate Zonisamide to 50 mg. Tr. at 292. He stated Plaintiff was taking Sumatriptan two to three times a week. *Id.* He noted Plaintiff's migraines were superimposed on chronic daily headaches that never fully remitted. *Id.*

30

Dr. Greenblatt noted normal findings on exam. Tr. at 297. He stated Plaintiff had not been consistent with her medications or ambulatory pain management due to psychosocial barriers. *Id.* He instructed Plaintiff to resume Riboflavin 200 mg twice a day, Enzyme CoQ10 100 mg three times a day, and magnesium oxide 420 mg daily and referred her to neurology pharmacology for Aimovig injections. Tr. at 297–98.

Plaintiff presented to Scott Matthew Koerber, M.D. ("Dr. Koerber"), for cardiology follow up on February 19, 2019. Tr. at 795. She reported daily episodes of sudden onset palpitations, fatigue, and shortness of breath that occasionally ended in syncope. *Id.* Dr. Koerber noted Plaintiff had worn a Zio patch that revealed multiple episodes of short non-sustained SVT. *Id.* He instructed Plaintiff to stop Atenolol and to increase her salt and water intake and scheduled for her to follow up for an intracardiac electrophysiology study ("EPS"). Tr. at 802.

On March 5, 2019, NP Lesieur helped Plaintiff to process anxiety related to a possible need for ablation surgery for SVT. Tr. at 787. His findings on MSE were consistent with prior exams. Tr. at 793.

Plaintiff complained of back pain on March 15, 2019. Tr. at 1347. She indicated she had developed a pulling pain in her right lower back while doing dishes the prior night. *Id.* She described the pain as shooting down her right buttock and outside leg to her right knee and foot upon bearing weight.

31

*Id.* Dr. Weathers observed Plaintiff to be limping, to have pain on palpation to the right side of her lower lumbar spine, to have pain down to her right knee with straight-leg raising ("SLR") test, and to demonstrate 3+ bilateral patellar deep tendon reflexes. Tr. at 1351. She prescribed a steroid taper and muscle relaxer, ordered an updated MRI, referred Plaintiff to physical therapy, and instructed her to use gentle stretching, ice, and heat. Tr. at 1352.

On March 25, 2019, an MRI of Plaintiff's lumbar spine redemonstrated an L5–S1 annular fissure of the disc, with resultant central and left paracentral disc protrusion, mildly effacing the left lateral recess and contacting the left S1 transiting nerve root. Tr. at 884. It also showed stable, mild-to-moderate left neural foraminal narrowing. *Id.*

Plaintiff returned to Taylor Vanderpool, Pharm. D. ("Dr. Vanderpool"), for neurology pharmacotherapy on March 27, 2019. Tr. at 1335. She reported slight improvement in her daily headaches, but no improvement to her migraines, after having received two Aimovig injections. Tr. at 1336. She endorsed increased constipation and hard stools, but admitted she had not been taking Ducosate. *Id.* She described migraines that occurred three to four times a week, lasted two to 12 hours, and were a 10 in severity. Tr. at 1337. Dr. Vanderpool recommended Plaintiff restart Ducosate and continue the 12-week trial of Aimovig. Tr. at 1340.

Plaintiff presented to physical therapist Jennifer Brodbeck ("PT Brodbeck") for a physical therapy consultation on April 8, 2019. Tr. at 883. She complained of lower back pain that radiated to her lower extremities. *Id.* PT Brodbeck noted minimal limitation to ROM of Plaintiff's lumbar spine, 4/5 bilateral ankle dorsiflexion, 4-/5 bilateral quad strength, 4-/5 bilateral hamstring strength, and 4/5 hip flexion. Tr. at 883–84. She requested Plaintiff be fitted for a back brace. Tr. at 969.

On April 9, 2019, state agency psychological consultant Kathleen Broughan, Ph.D. ("Dr. Broughan"), reviewed the record and completed a psychiatric review technique. Tr. at 88–89. She considered the following Listings: 12.04 for depressive, bipolar, and related disorders; 12.06 for anxiety and obsessive-compulsive disorders; and 12.07 for somatic symptom and related disorders. *Id.* She assessed no limitation in ability to adapt or manage oneself; mild limitation in ability to understand, remember, or apply information; and moderate limitation in ability to interact with others and ability to concentrate, persist, or maintain pace. *Id.* Dr. Broughan subsequently completed a mental residual functional capacity ("RFC") assessment in which she considered Plaintiff to be moderately limited as to the following abilities: to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without

interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with coworkers without distracting them or exhibiting behavioral extremes. Tr. at 94–96. She concluded Plaintiff's impairments were severe, but would not preclude simple, repetitive work tasks in a setting that did not require ongoing interaction with the public. Tr. at 89. She wrote:

1. The claimant is able to understand and remember simple instructions but could not understand and remember detailed instructions.
2. The claimant is able to carry out short and simple instructions but not detailed instructions. The claimant is able to maintain concentration and attention for periods of at least 2 hours.
3. The claimant would perform best in situations that do not require on-going interaction with the public.
4. The claimant would be expected to have difficulty working in close proximity or coordination with co-workers.
5. The claimant is able to be aware of normal hazards and can take appropriate precautions.

Tr. at 96.

Plaintiff presented to NP Lesieur for routine mental health follow up on April 23, 2019. Tr. at 1318. NP Lesieur's MSE findings were consistent with those on prior exams. Tr. at 1325.

On April 24, 2019, Plaintiff presented to Adebola Rojugbokan, M.D. ("Dr. Rojugbokan"), for a comprehensive consultative orthopedic examination.

Tr. at 828–33. She endorsed intermittent, sharp lower back pain that she rated as a four. Tr. at 830. She indicated her pain was worsened by movement, twisting, and lifting. *Id.* She related a medical history of migraine headaches, idiopathic hypersomnia, inflammatory bowel disease, tachycardia, chronic anxiety, and depression. *Id.* Dr. Rojugbokan recorded normal findings as to Plaintiff's vital signs, hearing, vision, neck, cardiovascular system, lungs, abdomen, extremities, cervical spine, shoulders, elbows, wrists, knees, hips, ankles, and hands. Tr. at 831–33. He noted Plaintiff had tenderness to palpation of the lumbar spine, diminished muscular strength because of pain, and reduced ROM with flexion to 85/90 degrees, extension to less than 5/25 degrees, and lateral flexion to less than 5/25 degrees. Tr. at 832. He otherwise noted no increased heat, redness, audible or palpable crepitus, malalignment, muscular atrophy, subcutaneous nodule, or skin changes to the lumbar spine. *Id.* He indicated Plaintiff had negative SLR test. Tr. at 833. He described Plaintiff as having a short gait, not shuffling the legs, and generally limping when she ambulated. *Id.* He stated Plaintiff was unable to squat, but could perform tandem, heel, and toe walking. *Id.* He recorded 5/5 upper and lower extremity strength. *Id.* He noted 2+ pulses and 2+ reflexes in Plaintiff's upper and lower extremities. *Id.* He assessed lower back pain, major depression, and chronic anxiety. *Id.* He stated Plaintiff was capable of seeing, hearing, reasoning, and managing her own funds. *Id.* X-rays showed mild facet

arthropathy of Plaintiff's lower lumbar spine, subtle levoconvex curve to the lumbar spine, and no acute fracture line. Tr. at 824. Plaintiff's right iliac crest was slightly higher than her left and partially seen, suggesting positioning versus subtle leg-length discrepancy. Tr. at 825.

Plaintiff presented to Karen Quach, Pharm. D. ("Dr. Quach"), for neurology pharmacology follow up on May 8, 2019. Tr. at 873. She indicated her symptoms had remained unchanged since starting Erenumab therapy. Tr. at 874. She described throbbing headaches starting at the right temple and wrapping around and indicated they were accompanied by nausea, photophobia, phonophobia, and vomiting at least once a week. *Id.* She said she experienced the headaches two to four times a week and they lasted two to 12 hours. *Id.* She complained that Erenumab continued to cause constipation, despite use of Ducosate. Tr. at 881. Dr. Quach added Senna for constipation. *Id.* She instructed Plaintiff to return in three weeks, following her fourth dose of Erenumab, to discuss constipation issues and possible titration. Tr. at 881–82. She noted she would consider transitioning Plaintiff to Galcanezumab if she continued to have constipation or to fail to respond to Erenumab. Tr. at 882.

Plaintiff indicated Nuvigil was not working well on May 14, 2019. Tr. at 867. She stated she had significant daytime sleepiness such that she could dose off upon sitting still for a short period. *Id.* She denied difficulty sleeping.

36

*Id.* Dr. Drummond noted Plaintiff had SVT in the past, but no tachyarrhythmias in several years and no problems with Nuvigil. Tr. at 873. He prescribed a low dose of Methylphenidate XR. *Id.*

Plaintiff attended physical therapy sessions on May 14 and 20. Tr. at 864–66. She generally denied relief from physical therapy. *See id.* During the May 20, 2019 physical therapy visit, physical therapist Suzanne Wilson ("PT Wilson") noted Plaintiff was "seen amb[ulating] in hall at fast pace without noted gait deviations; by the time p[atient] was amb[ulatory] into [physical therapy] gym, demo[nstrated] antalgic gait pattern with decreased [right lower extremity] step length/foot clearance as well as increased trunk flex." Tr. at 864–65. Plaintiff reported her pain with walking "comes and goes." Tr. at 865.

Plaintiff underwent EPS on May 23, 2019. Tr. at 845. The study was negative, suggesting Plaintiff's symptoms were not caused by SVT. *Id.*

Plaintiff followed up with Dr. Quach for neurology pharmacotherapy on May 30, 2019. Tr. at 1224. She reported little improvement in headaches and no change in migraines with Erenumab. Tr. at 1225. She endorsed no significant benefit from Riboflavin. *Id.* She described daily headaches with migraines occurring three to five times a week and causing her to vomit once a week. *Id.* Dr. Quach was hesitant to titrate Erenumab and recommend Plaintiff be transitioned to Galcanezumab. Tr. at 1233–34. She indicated

Plaintiff should wait until one month after her last Erenumab injection to receive a Galcanezumab injection. Tr. at 1234. She discontinued Riboflavin and instructed Plaintiff to continue Ducosate and Senna as needed for constipation, to continue magnesium oxide 420 mg and Duloxetine 60 mg daily, and to limit over-the-counter ibuprofen use to two or three times per week. *Id.*

On June 5, 2019, state agency medical consultant Christine Thompson, M.D. ("Dr. Thompson"), reviewed the record and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; avoid concentrated exposure to extreme heat and humidity; and avoid even moderate exposure to hazards. Tr. at 90–94.

Plaintiff presented to NP Lesieur for routine mental health follow up on June 5, 2019. Tr. at 1068. NP Lesieur's findings on MSE were consistent with prior observations. Tr. at 1076. He instructed Plaintiff to continue supportive therapy and medications. *Id.*

Plaintiff was discharged from physical therapy for lower back pain on June 24, 2019, as she reported no benefit from treatment. Tr. at 1065–67.

On July 17, 2019, Plaintiff complained of stabbing chest pain to the left of the midsternum that was accompanied by palpitations and occurred at random a few times a week. Tr. at 1058. She also endorsed right knee pain. *Id.* She reported daily episodes of chest tightness, heart racing, and dizziness that lasted for one to 30 minutes. Tr. at 1059. Dr. Weathers recorded normal findings on physical exam, aside from mild epigastric tenderness to palpation. Tr. at 1062. She noted an incidental finding of splenomegaly on cardiac MRI and ordered an ultrasound. *Id.* She also ordered chest x-rays and a proton pump inhibitor to address chest pain. *Id.* X-rays of Plaintiff's right knee showed normal findings. Tr. at 921. Chest x-rays indicated increased lucency of the right mid-to-upper lung, requiring further evaluation. Tr. at 922.

Plaintiff presented to NP Lesieur for routine follow up on July 18, 2019. Tr. at 1046. She acknowledged that her tendency to overthink things might be exacerbating her anxiety. Tr. at 1047. She complained of stress at home related to her relationship with her mother-in-law, her husband being away from home more due to a new job, and the addition of a puppy. *Id.* NP Lesieur's observations on MSE were consistent with prior findings. Tr. at 1054.

On July 23, 2019, pulmonologist Nicholas J. Pastis, M.D. ("Dr. Pastis"), reviewed Plaintiff's records and chest x-rays. Tr. at 946–47. He recommended

further investigation to rule out cystic lung diseases if Plaintiff was "truly symptomatic with sharp chest pain." Tr. at 947. He stated Dr. Weathers should order a non-contrast chest CT scan and refer Plaintiff to the pulmonary clinic if the CT scan was abnormal. *Id.*

On July 26, 2019, Plaintiff reported no change in frequency of headaches, but indicated her mood medication might have helped with the severity. Tr. at 1030. She indicated she continued to feel tired throughout the day. *Id.* Dr. Greenblatt recorded normal findings on exam. Tr. at 1039–40. He noted a diagnosis of fibromyalgia with tenderness to 13/18 American College of Rheumatology-designated trigger points and indicated Plaintiff should treat it with Duloxetine 60 mg daily and consider Pregabalin. Tr. at 1041. He continued Galcanezumab monthly, magnesium oxide 420 mg daily, and Sumatriptan 50 mg up to nine times per month and stopped CoQ10 due to lack of benefit. Tr. at 1040. He instructed Plaintiff to continue Motrin for tension-type headaches, but not to take it more than 15 times per month. *Id.*

On July 30, 2019, an abdominal ultrasound showed borderline splenomegaly. Tr. at 920.

Plaintiff presented to Wing-Kin Syn, M.D. ("Dr. Syn"), for a hepatology consultation on August 7, 2019. Tr. at 938. Dr. Syn noted Plaintiff had incidental splenomegaly on cardiac MRI and borderline splenic enlargement on a subsequent ultrasound. Tr. at 939. Dr. Syn explained to Plaintiff that

spleen size was subjective on ultrasound imaging, but that they would need to exclude liver disease as the reason for her enlarged spleen. Tr. at 944. He ordered elastography and liver screens to include autoimmune screens. *Id.*

Plaintiff returned to PT Wilson for a consultation as to right knee pain on August 8, 2019. Tr. at 950. She endorsed medial/lateral knee pain that was shooting into the infrapatellar area and sometimes caused her knee to buckle. *Id.* PT Wilson noted no atrophy, decreased bilateral vastus medialis oblique bulk, intact sensation, increased flexion, rounded shoulders, bilateral knee valgus, no pes planus, good ankle alignment, medial wear on the inside of Plaintiff's shoe, slightly antalgic gait pattern with decreased stand on the right, grossly normal bilateral lower extremity active ROM with complaints of pain at end ROM on flexion of the right knee, gross weakness of the bilateral lower extremities, 3+/5 cogwheeling, and no joint laxity. Tr. at 950–51. Clarkes (grind, patellar compression) and valgus stress tests were positive for pain, but all other special tests were negative. Tr. at 951. PT Wilson recommended physical therapy and home exercises and requested Plaintiff be fitted for a knee brace. Tr. at 931, 951.

On August 15, 2019, a second state agency psychological consultant Michael Neboschick, Ph.D. ("Dr. Neboschick"), considered Listings 12.04, 12.06, and 12.07 and assessed mild difficulties in Plaintiff's ability to understand, remember, or apply information and moderate difficulties in her

abilities to interact with others, adapt or manage oneself, and concentrate, persist, or maintain pace. Tr. at 105–07. He assessed the same mental RFC as Dr. Broughan, except he also considered Plaintiff to be moderately limited in her ability to respond appropriately to changes in the work setting. *Compare* Tr. at 94–96, *with* Tr. at 112–14.

On August 19, 2019, a second state agency medical consultant, Stacy Weil, M.D. ("Dr. Weil"), assessed the same physical RFC as Dr. Thompson, except for determining Plaintiff capable of frequent stooping. *Compare* Tr. at 90–94, *with* Tr. at 108–12.

Plaintiff followed up with NP Lesieur for routine mental health treatment on August 23, 2019. Tr. at 1430. She reported some improvement on Methylphenidate, though she continued to feel unrested. Tr. at 1431. She indicated she had recently been diagnosed with fibromyalgia. *Id.* NP Lesieur recommended a prescription for Gabapentin, but Plaintiff declined it, as she had experienced severe nausea when she tried it in the past. *Id.* He suggested a trial of Pregabalin for pain. *Id.* Plaintiff rated her mood as a four. *Id.* She endorsed some improvement with the increased dose of Duloxetine, and agreed to a further increase to 90 mg. *Id.* NP Lesieur's observations on MSE were consistent with prior visits. Tr. at 1437–38.

Plaintiff presented for neurology pharmacotherapy on August 26, 2019. Tr. at 1419. She indicated she did not like the Galcanezumab injections and

had noticed no improvement in her headaches or migraines. *Id.* She described daily headaches, migraines occurring three to five times a week and lasting two to 12 hours, and intensity ranging from an eight to a 12 on a 10-point scale. Tr. at 1420. Audrey L. Kivlehan, Pharm. D. ("Dr. Kivlehan"), noted Plaintiff endorsed compliance, though there was a discrepancy with her refill history, and she admitted to hesitation with injections and not having received a Galcanezumab injection for at least more than a month-and-a-half. Tr. at 1427. Dr. Kivlehan suspected Plaintiff's high utilization of abortive medications could be contributing to her headache symptoms. *Id.* She instructed Plaintiff to continue monthly Galcanezumab injections and to use Sumatriptan and ibuprofen on a limited basis. *Id.*

On September 11, 2019, Dr. Drummond wrote a letter expressing the following:

> [Plaintiff] is a patient that I see at the Charleston VA and treat for idiopathic hypersomnia. She experiences intrusive sleep on a daily basis. She underwent an overnight sleep test in 2011 which showed a short sleep latency, short REM latency, and high sleep efficiency. These findings can be seen with narcolepsy and idiopathic hypersomnia. [A] multiple sleep latency test (MSLT) was conducted and confirmed a severe degree of objective hypersomnia with a mean sleep latency of 4.1 minutes. [Plaintiff] has intrusive sleep events at least once a day and "never has a day without it."
>
> Medical guidelines for patients with her degree of hypersomnia include avoidance of potentially dangerous activities or employment where injury to self or others may result from the patient suddenly falling asleep. Patients are advised not to drive

or operate dangerous equipment if tired or sleepy. For optimal performance in a "safe" form of employment, scheduled naps are often very helpful.

Tr. at 1416–17.

On October 16, 2019, NP Lesieur included a letter in Plaintiff's record noting the following:

> [Plaintiff] has been treated in the Outpatient Mental Health Clinic at the Ralph H. Johnson V.A. Medical Center Since 8/26/13 and I have worked with [Plaintiff] continuously since 3/6/17. I have worked with [Plaintiff] as a Psychiatric/Mental Health Nurse Practitioner for treatment of mental health issues utilizing medication management and evidence-based psychotherapy. She has been diagnosed with Major Depression, Anxiety Disorder, and additional medical problems including Fibromyalgia, Chronic Migraines, Atrial Tachycardia, Idiopathic Hypersomnia/ Narcolepsy, and Irritable Bowel Syndrome. [Plaintiff] reports continued impairment in many areas of functioning due to anxiety, depression, and other medical problems. Her multiple complex medical co-morbidities have had a profound impact on her mental health, and her disabling mental health condition has caused exacerbation of many of her medical problems. She reports experiencing severe anxiety and/or panic attacks in situations that are moderately stressful, in many situations where people are present, and experiences prolonged psychological discomfort following these anxiety attacks. [Plaintiff] feels she cannot handle stress like she used to, and reports that these difficulties have interfered with her occupational, social and recreational functioning. She states she used to be able to let problems go more quickly; however now she dwells on situations and feels upset for hours at a time. She no longer engages in the kinds of relaxation activities that she used to and describes minimal stress management skills. She typically uses escape and withdrawal to manage her anxiety and avoids situations that require active engagement. She feels a need to carefully structure her environment to achieve some level of comfort (e.g., sitting closest to escape routes; sitting behind people so they are not aware of her distress, etc.).

In addition to dealing with chronic pain from her back, fibromyalgia, and migraines, [Plaintiff] continues to struggle with depression and chronic fatigue. This makes it extremely difficult to get out of bed most days or to sustain effort with many everyday tasks. This causes increased frustration, irritability, poor concentration/focus, and decreased distress tolerance.

As a result of these disabilities, she continues to experience problems with interpersonal relationships which would prevent her from sustaining employment. Her inability to tolerate stress and overall lack of effective coping skills makes it impossible to maintain employment. In spite of interventions including medication management as well as individual therapy, she continues to experience psychological problems that significantly impact her everyday functioning. Based on these conditions, it is clear that [Plaintiff] meets the criteria of being permanently and completely disabled. I feel that employment would greatly exacerbate her suffering and worsen her already deteriorating condition.

Tr. at 1410–11.

Plaintiff followed up for neurology pharmacotherapy on October 29, 2019. Tr. at 1401. She reported no change in headache symptoms with Galcanezumab. *Id.* She indicated she did not like the injections and had discontinued them following her last injection on September 1. *Id.* She indicated she was taking Duloxetine 90 mg daily, Advil Migraine two to three times a week, as needed, and Sumatriptan 50 mg nine times a month, as needed. Tr. at 1402. She noted Sumatriptan caused drowsiness, but allowed her to sleep off her migraines. *Id.* Pharmacy student Lauren Koller recommended Plaintiff increase Sumatriptan to 100 mg and take

Promethazine 25 mg for nausea and vomiting. Tr. at 1408. Dr. Martin approved the plan. Tr. at 1400, 1408.

On October 30, 2019, Nabil Atalla, M.D.[5] ("Dr. Atalla"), included the following note in Plaintiff's medical record: "[Plaintiff] has a letter from mental health regarding her disabilities. Migraine is not a medical condition that interferes with education and employment." Tr. at 1409.

On November 21, 2019, Plaintiff reported good benefit and no side effects from Methylphenidate XR 20 mg, but indicated she still experienced periods of sleepiness and dozed off easily. Tr. at 1391. Dr. Drummond increased Methylphenidate to 36 mg. Tr. at 1397.

Dr. Drummond wrote a second letter on November 26, 2019, that contained many of the same impressions as his September 11, 2019 letter. Tr. at 1390–91. He further indicated Plaintiff "dozes off easily" and explained that the MSLT "includes 5 nap opportunities over the course of a day and the mean sleep latency is the average time it takes a patient to fall asleep. A result of 8 minutes or less is considered pathologically sleepy." *See id.*

On November 27, 2019, Plaintiff complained of spontaneous and unexplained bruising on her arms and ankles. Tr. at 1375. Dr. Syn noted a liver screen was negative and autoimmune markers were in the normal

---

[5] Dr. Atalla was the attending physician who supervised Dr. Greenblatt, a resident physician. Dr. Greenblatt's treatment notes indicate that Dr. Atalla reviewed and approved his plans of care. *See* Tr. at 298, 390, 1040.

range. *Id.* He explained to Plaintiff that all tests were negative and there was no evidence of liver damage. Tr. at 1381. He noted the ultrasound finding of splenomegaly was subjective and often over-interpreted. *Id.* He indicated he would consult with a hematologist as to Plaintiff's bruising, as he found no clear reason for it. *Id.*

Plaintiff also presented to Dr. Martin for neurology pharmacotherapy on November 27, 2019. Tr. at 1383. Plaintiff reported daily headaches with migraines several times a week. *Id.* She indicated she was taking Sumatriptan 100 mg as needed, Advil migraine two to three times per week, and Promethazine for nausea, which helped somewhat. *Id.* She described the intensity of her headaches as ranging from a three to a seven. Tr. at 1384. Dr. Martin recommended neurology follow up and offered to retrial medications or a combination of medications if Plaintiff was interested in doing so. Tr. at 1389.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing, Plaintiff testified she wore a back brace when she anticipated walking, sitting, or standing for a long period. Tr. at 38. She indicated the physical therapist had initially prescribed one two years prior and had issued a new one a year prior. Tr. at 38, 39. She said she did not use

it all the time, but wore it for three to four hours a day, depending on her activity. *Id.* She stated she wore it on the outside of her clothes, as it was more comfortable. Tr. at 39.

Plaintiff testified she lived in a house with her husband and four-year-old son. Tr. at 39–40. She stated her husband was employed as a finance manager. Tr. at 40. She indicated her son had some medical problems that affected his bowels and nail growth. *Id.* She said she maintained his nails, administered his medications two to three times a day, and wiped him after bowel movements. *Id.*

Plaintiff testified that she began to experience increased migraines and back pain in January 2016, following her son's birth in April 2015. Tr. at 40–41. *Id.* She said her migraines caused vomiting, necessitating she visit the hospital around January 2016. *Id.* She admitted she worked at Lowe's for three or four months in 2016, earning approximately $4,300. Tr. at 41–42.

Plaintiff said she provided care to her 11-year-old stepson when he visited every other weekend. Tr. at 43. She stated her four-year-old son had been enrolled in preschool, but was no longer enrolled due to a problem with his ears. *Id.* She admitted she assisted her four-year-old with bathing, feeding, and personal needs. *Id.* She said a typical day involved "running around chasing him." *Id.* She indicated she spent a lot of time on the couch when she was in pain, but got up to clean her son, get him drinks, and play

with him. Tr. at 44. She said she struggled to perform housework and paced herself in doing it. *Id.* She noted she visited the grocery store as necessary. *Id.* She stated she cleaned dishes and laundry, cooked, and engaged in gaming to keep her mind active. *Id.* She admitted she used a computer and a smartphone for gaming, social media, and emails. Tr. at 44–45.

Plaintiff testified she was 5'9" tall and weighed 133 pounds, which represented an increase from her normal weight of 125 pounds. Tr. at 45. She stated endometriosis treatment caused her to gain weight. *Id.* She indicated she had completed high school and attended two years of college without having obtained a degree or certification. Tr. at 45–46. She confirmed that she had served in the Navy from 2007 to 2011 and had received an honorable discharge. Tr. at 46. She stated she had ordered, tracked, and delivered supplies and parts for helicopter maintenance in her job as a logistics specialist. Tr. at 46–47. She indicated she also operated forklifts and loaded trucks in that position. Tr. at 47. She said she lifted 10 to 20 pounds frequently and up to 40 pounds occasionally on the job. Tr. at 47–48.

Plaintiff indicated she was receiving disability benefits from the Department of Veterans Affairs ("VA"). Tr. at 49. She said she had a 100% disability rating and received $3,260 per month. *Id.* She denied having been found eligible based on individual unemployability. *Id.* She indicated she had received no unemployment or workers' compensation benefits. *Id.*

49

Plaintiff testified she was right-handed. Tr. at 50. She confirmed that she had a driver's license and said she drove herself to the hearing. *Id.* She denied smoking, using illegal drugs, and drinking more frequently than on a social basis. *Id.* She denied having applied for work since April 2016. Tr. at 50–51. She stated the only work she had performed was as a click worker for Amazon, completing online surveys and transcribing jobs at her own pace. Tr. at 51. She said she earned "a cent or two cents" per task, performed the job for less than an hour a day, and earned less than $50 over the prior year. Tr. at 51–52.

Plaintiff testified she had previously worked for about two years for Animal Medical Center as a boarding kennel technician. Tr. at 52–53. She stated she had worked for Lowe's as a cashier and in customer support, running the returns desk. Tr. at 53. She said she had also been employed by Wal-Mart, working 30 hours a week as a cashier for about a year. Tr. at 54–55.

Plaintiff confirmed that she continued to receive treatment for depression and anxiety. Tr. at 55. She said she would shake and have difficulty breathing when around new people. Tr. at 56. She noted she had first developed panic attacks while working at Lowe's. Tr. at 57. She said she did not like to leave her house by herself. *Id.* She admitted she was able to take her son to doctors' appointments, explaining it was easier for her when

her son was with her because others were focusing on him, as opposed to her. *Id.* She said she had some difficulty going to the grocery store by herself and would get in and out as quickly as possible. Tr. at 57–58. She admitted she had visited her child's preschool and interacted with the teachers and others while he was enrolled. Tr. at 58. She said her medication somewhat relieved her panic attacks, reducing their severity from a seven or eight to a four to six. Tr. at 58–59.

Plaintiff testified she had left her job at Lowe's to attend college courses. Tr. at 59. She said she was a full-time student for a year after she stopped working, earning a 4.0 grade point average. *Id.* She said she was "able to pull it together" to complete her coursework, but "was a mess" at home, fighting with her husband and screaming and yelling because of the stress. Tr. at 60. She further explained that her anxiety was triggered by crowded spaces and elevators, as well as being around strangers. *Id.*

Plaintiff stated she was receiving treatment for depression and felt as if she were not good enough. *Id.* She indicated she had difficulty with concentration and focus. *Id.* She admitted she provided care for her son when she was home during the day, but noted her mother-in-law would take him on days when she was struggling and in a lot of pain. Tr. at 61. She indicated her son had spent two to three days per week with her mother-in-law over the prior seven-month period. *Id.* She said it was easier to leave her house

with her husband because she felt as if he could protect her. *Id.* She stated her husband and mother-in-law encouraged her to do things around the house and attend treatment visits. Tr. at 62.

Plaintiff testified she was taking medication for hypersomnia. *Id.* She denied having good benefit from medication, but said it helped somewhat. Tr. at 63. She stated she felt sleepy, hyper, and shaky at the same time. *Id.* She said she continued to have episodes where she was too sleepy to function three or four times a week. *Id.* She indicated her son had woke her from sleep during the day. *Id.* She denied that her doctor had instructed her to avoid driving all together, but admitted he had told her to avoid driving when tired or sleepy. Tr. at 63–64.

Plaintiff admitted she continued to receive treatment for migraines. Tr. at 64. She stated her doctor had recently prescribed a new medication, but she had not yet started it. *Id.* She said she was experiencing migraines three to four times a week. Tr. at 65. She indicated she had daily headaches that would progress to a point that she developed sensitivity to light and sound and had to lie down in a dark room. *Id.* She said the pain was sometimes so intense that it caused her to vomit. *Id.* She noted she took Sumatriptan, but it caused her to feel sleepy. *Id.* She stated her doctor had also prescribed medication for nausea. *Id.* She said she called her mother-in-law to pick up her son on days when she was experiencing migraines. Tr. at 66.

Plaintiff stated she had a limp that was possibly associated with damage to her knees. *Id.* She said she had knee pain and back pain. Tr. at 67. She noted her back pain was typically a four, but increased to an eight or nine on two days a week. *Id.* She indicated her right knee would "go out from under [her]" at times. *Id.* She stated she had informed her primary care physician that her right leg felt noticeably weaker than her left. Tr. at 68. She denied side effects from medications other than Sumatriptan. *Id.* She said she did not remain in any one position for a long period during a typical day. *Id.* She stated she would nap when her son was not home and would be alone with him from 7:00 AM until 6:00 PM on days when he remained with her. Tr. at 68–69. She said she stayed alone with her son for a longer period on Thursdays, when her husband worked until 8:00 PM. Tr. at 69. She indicated her son did not nap during the day. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") Lavonne Brent reviewed the record and testified at the hearing. Tr. at 70–80. The VE categorized Plaintiff's PRW as a warehouse worker, *Dictionary of Occupational Titles* ("*DOT*") No. 922-687-058, requiring medium exertion with a specific vocational preparation ("SVP") of 2; a logistics, shipping, and receiving clerk, *DOT* No. 222.387-050, as requiring medium exertion with an SVP of 5; a cashier, *DOT* No. 211.462-010, as requiring light exertion with an SVP of 2; a kennel attendant, *DOT*

No. 410.674-010, as requiring medium exertion with an SVP of 4; and a retail customer support specialist, *DOT* No. 299.367-010, as requiring light exertion with an SVP of 4. Tr. at 71–73. The VE confirmed that Plaintiff performed a composite job as a cashier and a customer support specialist at Lowe's. Tr. at 73. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work requiring the following: occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally balancing, stooping, kneeling, and crouching; never crawling, working around unprotected heights, dangerous machinery, or moving, mechanical parts; never operating a motor vehicle as an occupational requirement; avoiding concentrated exposure to humidity, extreme cold, and extreme heat; no exposure to open flames or open bodies of water; limited to simple and routine tasks; limited to simple work-related decisions regarding both use of judgment and changes in a routine work setting; occasionally interacting with coworkers and supervisors; no tandem or teamwork-type tasks; no greater than incidental interaction with the public; and off-task no more frequently than could be accommodated by ordinary breaks. Tr. at 73–74. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 74. The ALJ asked whether there were any other jobs in the economy that the hypothetical person could perform. Tr. at 75. The VE identified light jobs with an SVP of 2 as a checker, *DOT* No.

221.587-018, an inspector, *DOT* No. 529.687-058, and a sorter, *DOT* No. 753.587-010, with 130,000, 68,000, and 434,000 positions in the national economy, respectively. Tr. at 75.

The ALJ asked the VE to further assume the hypothetical individual would require a sit/stand option, defined as a brief postural change at or near the workstation, no more frequently than twice in an hour and for a duration of no greater than five minutes each time. *Id.* He asked if the individual would be able to perform the jobs the VE previously identified. *Id.* The VE testified in the affirmative. *Id.* She clarified that her response was based on her training and experience, as a sit/stand option was not addressed in the *DOT. Id.*

The ALJ asked the VE to consider that the individual described in the first hypothetical question would be limited to sedentary work. Tr. at 76. He confirmed that the individual would be unable to perform Plaintiff's PRW. *Id.* The VE identified sedentary jobs with an SVP of 2 as a cutter, *DOT* No. 249.587-014, a sorter, *DOT* No. 521.687-086, and a stuffer, *DOT* number 731.685-014, with 300,000, 434,000, and 354,000 positions in the national economy, respectively. *Id.* He asked the VE to consider a limitation to sedentary work and the additional restrictions included in the second hypothetical question. Tr. at 76–77. He asked if the individual would remain capable of performing the sedentary jobs the VE previously identified. Tr. at

77. The VE confirmed that the individual would remain capable of performing the jobs and that her response was based on her training and experience. *Id.*

The ALJ asked the VE to consider that the hypothetical individual's cumulative ability to stand and/or walk would be reduced to one hour in an eight-hour workday. *Id.* He asked if the additional restriction would eliminate all sedentary positions. *Id.* The VE testified it would. *Id.*

The ALJ asked the VE to consider that the hypothetical individual would be limited to standing and/or walking for three hours in an eight-hour workday. *Id.* He asked the VE if the restriction would eliminate light work. *Id.* The VE stated it would. *Id.*

The ALJ asked the VE to describe the ordinary break pattern in the workplace and to explain at what point an individual's being off task would eliminate sedentary and light work. *Id.* The VE testified that typical breaks included a 15-minute morning break, a 15-minute afternoon break, and a 30-minute lunch break and that greater than 10% of time off-task outside of those breaks would result in an employee's termination. Tr. at 78.

The ALJ asked the VE to identify when consistent absenteeism would likely result in elimination of work. *Id.* The VE stated absences occurring more than one day per month would result in termination. *Id.*

The ALJ confirmed with the VE that her testimony was consistent with the *DOT* and its companion publications, except as to interactions, a sit/stand option, time off task, and absenteeism. Tr. at 79. The VE affirmed that the portion of her testimony not addressed in the *DOT* was based on her training, education, and work experience. *Id.*

The ALJ asked the VE to consider that the individual would have marked loss in the ability to perform one of the basic mental demands for unskilled work. *Id.* He questioned whether such a restriction would eliminate all work. Tr. at 79–80. The VE confirmed that it would. Tr. at 80.

The ALJ asked the VE to consider that the individual would not be able to perform work on a consistent basis, eight hours a day, and 40 hours a week at any exertional level. *Id.* The VE testified this would eliminate all work. *Id.*

### 2. The ALJ's Findings

In his decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2020.
2. The claimant has not engaged in substantial gainful activity since April 1, 2016, the amended alleged onset date (20 CFR 404.1571 *et seq.*).
3. The claimant has the following severe impairments: depression, degenerative disc disease of the lumbar spine, and migraine headaches (20 CFR 404.1520(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of

the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except occasional climbing ramps and stairs; occasional balancing, stooping, kneeling, and crouching; never climbing ladders, ropes, or scaffolds; never crawling; never working on unprotected heights; never working with dangerous machinery and moving mechanical parts; never operating a motor vehicle as an occupational requirement; never working around open flames or open bodies of water; allowing a sit/stand option defined as a brief postural change at or near the work station no more frequent than twice in an hour and a duration of no greater than 5 minutes each; avoiding concentrated exposure to humidity, extreme cold, and extreme heat; limited to the performance of simple and routine tasks; simple work related decisions as to use of judgment and dealing with changes in a routine work setting; occasional interaction with supervisors and coworkers (though no tandem or teamwork type tasks); no more than incidental contact with the public; and time off task is accommodated by ordinary breaks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on November 18, 1988 and was 27 years old, which is defined as a younger individual age 18–44, on the amended alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2016, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 14–25.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ erred in considering the severity of and limitations imposed by idiopathic hypersomnia at step two and in the RFC assessment;

2)    the ALJ failed to evaluate the combined effect of all Plaintiff's impairments; and

3)    the ALJ improperly evaluated Plaintiff's subjective allegations.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[6] (4) whether such impairment prevents claimant from performing PRW;[7] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a

_____

[6] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[7] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65

(4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is

rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

### B.    Analysis

#### 1.    Idiopathic Hypersomnia

Plaintiff argues the ALJ erred in assessing idiopathic hypersomnia as non-severe at step two. [ECF No. 18 at 17]. She maintains the evidence contradicts the ALJ's finding that the impairment caused only minor interruption to her performance of workplace activities. *Id.* She contends the ALJ's inclusion in the RFC assessment of restrictions as to heights, hazards, and heat did not adequately address the restrictions imposed by the impairment. *Id.* at 17–18.

The Commissioner argues the ALJ properly concluded idiopathic hypersomnia did not significantly limit Plaintiff's ability to perform basic work activities, assessed other impairments as severe at step two, and considered idiopathic hypersomnia in subsequent steps. [ECF No. 20 at 11]. He maintains that any error in assessing the severity of the impairment was remedied by the ALJ's consideration of it in assessing Plaintiff's RFC. *Id.* at 12. He contends the ALJ was not required to specifically consider Dr.

Drummond's statement that scheduled naps were "often very helpful" in optimizing workplace performance. *Id.* He claims the ALJ sufficiently concluded that the evidence supported routine breaks and environmental restrictions to accommodate Plaintiff's hypersomnia. *Id.*

A severe impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). "An impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at [step two] when the medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, and work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities)." SSR 85-28. Examples of basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, coworkers, and usual work situations; and (6) dealing with changes in a work setting. 20 C.F.R. § 404.1522(b).

The ALJ addressed idiopathic hypersomnia at step two as follows:

64

> The undersigned finds that the claimant's medically determinable impairment of idiopathic hypersomnia is nonsevere because it does not significantly limit the ability to perform basic work activities for 12 consecutive months (SSR 85-28). The medical evidence suggests no more than slight abnormalities related to idiopathic hypersomnia, such as excessive daytime sleepiness, sudden loss of muscle tone, sleep paralysis, or hallucinations (see SSR 85-28). Accordingly, the undersigned finds this impairment is nonsevere.

Tr. at 15.

The record does not support the ALJ's conclusion that idiopathic hypersomnia had not significantly limited Plaintiff's ability to perform basic work activities for 12 consecutive months. The record contains evidence that arguably suggested idiopathic hypersomnia affected Plaintiff's ability to remain awake to complete a normal workday. *See* Tr. at 63 (reflecting Plaintiff's testimony that she felt too sleepy to function on three or four days per week and that her son had woke her from sleep at times); Tr. at 473, 730, 1030 (noting Plaintiff's complaints of feeling sleepy during the day, despite having slept for a significant period the prior night). In June 2016, the MSLT results showed that Plaintiff napped five times during the test, with sleep latency in as little as two minutes and mean sleep latency of 4.1 minutes. Tr. at 772–73. As a practical matter, Plaintiff fell asleep five times, in as little as two minutes, throughout the course of a day when she had slept during the prior night. Dr. Drummond explained that the MSLT results showed Plaintiff was pathologically sleepy, given her mean sleep latency of less than eight

minutes. Tr. at 1391. Although the ability to stay asleep is not included in the examples of basic work activities in the regulations, it is reasonable to assume an individual who is excessively sleepy or unable to remain awake throughout the course of an eight-hour workday would be significantly limited in her physical and mental abilities to do basic work activities. Thus, the ALJ erred in characterizing idiopathic hypersomnia as a non-severe impairment.

Should an ALJ err in evaluating the severity of a claimant's impairment at step two, his advancement to subsequent steps may render his error harmless. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). An ALJ may remedy an error in evaluating the severity of a claimant's impairment by considering its functional limitations in assessing her RFC. *See Washington v. Astrue*, 98 F. Supp. 2d 562, 580 (D.S.C. 2010) (providing that the court "agrees with other courts that find no reversible error where the ALJ does not find an impairment severe at step two provided that he or she considers that impairment in subsequent steps").

A claimant's RFC represents "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ must "consider all of the

claimant's 'physical and mental impairments, severe and otherwise, and determine, on a function-by-function basis, how they affect [the claimant's] ability to work.'" *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016)).

"[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Id.* at 311. The ALJ should consider all the relevant evidence and account for all the claimant's medically-determinable impairments in the RFC assessment. 20 C.F.R. § 404.1545(a). He must include a narrative discussion that cites "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)" and explains how all the relevant evidence supports each conclusion. SSR 96-8p, 1996 WL 374184, at *7. He must also explain how any material inconsistencies or ambiguities in the record were resolved." SSR 16-3p, 2016 WL 1119029, at *7. "A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling," including "a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288 (4th Cir. 2013). In *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), the court provided that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or

where other inadequacies in the ALJ's analysis frustrate meaningful review.'"

(quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

In discussing the RFC assessment, the ALJ acknowledged Plaintiff's

testimony that her medication for hypersomnia "help[ed] somewhat," but she

"continue[d] to fall asleep at least 3 to 4 times per week." Tr. at 18. He

further discussed Plaintiff's idiopathic hypersomnia as follows:

> The claimant receives treatment in the sleep apnea clinic for
> complaints of excessive daytime sleepiness. However, this
> treatment is infrequent, with routine follow up occurring every 6
> months to 1 year. A 2011 sleep test was consistent with
> narcolepsy and idiopathic hypersomnia. A sleep latency test
> confirmed a severe degree of objective hypersomnia. While her
> treating physician, Dr. Drummond, indicated a diagnosis of
> narcolepsy with residual hypersomnia at one point, his more
> recent statements note that the claimant is treated for idiopathic
> hypersomnia (Exhibits 1F, 6F, and 7F).

Tr. at 20–21. The ALJ summarized Dr. Drummond's letters, finding his

"opinion to be persuasive regarding the need for environmental restrictions

for safety, as it [was] well supported and consistent with treatment records."

Tr. at 22–23. He wrote: "The restrictions against exposure to heights and

hazards, as well as the need to avoid extreme heat that may predispose the

claimant to drowsiness are included, out of an abundance of caution, due to

her non-severe impairment of hypersomnia." *Id.*

Although the ALJ included some environmental restrictions to address

Plaintiff's idiopathic hypersomnia, his explanation for his RFC assessment

fails to reconcile evidence of greater restrictions. The ALJ acknowledged Dr. Drummond's opinion that "[s]cheduled naps were often helpful for optimal performance in a 'safe' form of employment." Tr. at 23. He also recognized evidence that appeared to support this element of his opinion, noting that the record showed that Plaintiff had "periods of sleepiness and dozed off easily." *See id.* The ALJ credited Dr. Drummond's opinion to the extent that he included environmental restrictions for safety, but neither rejected his opinion as to a need for scheduled naps nor included such a provision in the RFC assessment, despite his recognition that the record showed Plaintiff to have "periods of sleepiness and to "doze[ ] off easily."

The undersigned rejects the Commissioner's argument that the ALJ found Plaintiff's idiopathic hypersomnia could be accommodated through ordinary breaks. The ALJ concluded that Plaintiff's mental impairments could be accommodated by normal breaks, as indicated by his reliance on the state agency psychological consultants' opinions. *See* Tr. at 21 (discussing and finding generally persuasive Drs. Broughan's and Neboschick's opinions that Plaintiff could maintain concentration and attention for periods of at least two hours). He did not explicitly reject Plaintiff's testimony or Dr. Drummond's opinion as to time off-task due to idiopathic hypersomnia. Although he noted that Plaintiff had infrequent treatment in the sleep apnea clinic occurring every six months to a year and that there was some

discrepancy as to whether her diagnosis was narcolepsy or idiopathic hypersomnia, he did not explain how such evidence would undermine Plaintiff's allegations or Dr. Drummond's opinion. *See* Tr. at 20–21. Thus, in contravention of SSR 16-3p, the ALJ failed to explain how he resolved the material inconsistency between Dr. Drummond's opinion and the RFC assessment, which did not allow for rest periods in addition to normal breaks.

Given the ALJ's failure to adequately consider idiopathic hypersomnia at step two and in subsequent steps, the undersigned recommends the court remand the case for further consideration of the impairment in accordance with the applicable regulations and SSRs.

### 2.    Combined Effect of Impairments

Plaintiff argues the ALJ failed to evaluate the combined effect of all her impairments. [ECF No. 18 at 18]. She maintains the ALJ's matching of impairments to restrictions failed to account for the combined effect of her severe and non-severe physical and mental impairments. *Id.* at 19–20.

The Commissioner argues the ALJ evaluated the combined effect of Plaintiff's impairments. [ECF No. 20 at 13–15]. He maintains the ALJ's separate consideration of each of Plaintiff's impairments was sufficient to demonstrate that he considered their combined effect. *Id.* at 13–14. He contends that even if the ALJ's consideration of Plaintiff's impairments was

fragmentized, Plaintiff has not demonstrated that his evaluation of their effects resulted in error. *Id.* at 14–15.

If a claimant has multiple impairments, the ALJ is required to "consider the combined effect of all [her] impairments without regard to whether any such impairment, if considered separately would be of sufficient severity." 20 C.F.R. § 404.1523(c). In *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989), the court described the ALJ's error as follows:

> After finding that the claimant failed to meet a listing, the ALJ went on to discuss each of claimant's impairments but failed to analyze the cumulative effect the impairments had on the claimant's ability to work. He simply noted the effect or noneffect of each and found that the claimant could perform light and sedentary work. It is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render the claimant unable to engage in substantial gainful activity. In recognizing this principle, this court has on numerous occasions held that in evaluating the effect[] of various impairments upon a disability benefit claimant, the Secretary must consider the combined effect of a claimant's impairments and not fragmentize them. *Richenbach v. Heckler*, 808 F.2d 309 (4th Cir. 1985); *DeLoatche v. Heckler*, 715 F.2d 148 (4th Cir. 1983); *Oppenheim v. Finch*, 495 F.2d 396 (4th Cir. 1974); *Hicks v. Gardner*, 393 F.2d 299 (4th Cir. 1968); *Griggs v. Schweiker*, 545 F. Supp. 475 (S.D.W.Va. 1982).

It must be "clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-cv-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012) (citing *Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir.

1995)). However, absent evidence to the contrary, the court should accept the ALJ's assertion that he considered the combined effect of the claimant's impairments. *See Reid v. Commissioner of Social Sec.*, 769 F.3d 861, 865 (4th Cir. 2014); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter.").

The undersigned notes that in *Reid*, the court cited to the following excerpt from the ALJ's decision:

> [T]he undersigned has considered *the combined effects* of the claimant's impairments, both severe and non-severe, and has determined that the findings related to them are not at least equal in severity to those described in Listings 1.00, 4.00, 11.00, and 12.00. In this consideration, the undersigned has specifically considered *the cumulative effects of the impairments* on the claimant's ability to work. *See also Walker v. Bowen*, 889 F.2d 47 (4th Cir. 1989). The undersigned notes that the claimant's heart condition was asymptomatic despite his history of obesity. Even with consideration of *the combined effects* of the claimant's obesity, treatment records fail to indicate that the claimant's degenerative disc disease status post fusion resulted in an inability to ambulate or perform fine or gross motor movements effectively. The claimant's physical impairments obviously affected his mental health condition. Nevertheless, when considered *in conjunction*, no further limitation in the claimant's mental health condition, other than those discussed above, are warranted.

*Reid*, 769 F.3d 861, 866 (emphasis added by court). Thus, in *Reid*, the ALJ

provided a specific explanation as to how he considered the combined effect of

all the claimant's physical and mental impairments.

Here, the ALJ asserted that he had considered the combined effect of

Plaintiff's impairments, writing:

> Finally, the undersigned has considered the combined effect of
> the claimant's impairments and the possibility that the combined
> effect can be greater than each of the impairments considered
> separately. 20 CFR 404.1526(b)(3) and 416.926(b)(3) and *Walker
> v. Bowen*, 889 F.2d 47 (4th Cir. 1989). The claimant's
> impairments have been considered when assessing the claim
> under the listings and during the other steps of the sequential
> evaluation process, including when assessing the claimant's
> residual functional capacity. While the combination of the
> claimant's impairments imposes some limitations, there is no
> indication that the combination of the claimant's impairments
> imposes greater limitations than those inherent in the residual
> functional capacity stated below.

Tr. at 17. However, unlike that of the ALJ in *Reid*, his statement is more

akin to boilerplate language.

A review of the ALJ's decision as a whole reveals some contemplation

as to how Plaintiff's impairments affected her in conjunction. The ALJ

separately discussed evidence as to back and bilateral leg pain, headaches

and migraines, persistent depressive disorder and anxiety disorder, and

idiopathic hypersomnia. Tr. at 19–21. He addressed the medical opinions of

record, noting he found generally persuasive the state agency psychological

consultants' opinions that Plaintiff's mental impairments would allow her to

understand and remember simple instructions, carry out short and simple instructions, perform routine tasks, maintain concentration and attention for periods of at least two hours, and perform best in situations that did not require ongoing interaction with the public, working in close proximity or coordination with coworkers, or adapting to frequent requests for change. Tr. at 21. The ALJ discussed NP Lesieur's opinion, rejecting that portion in which he opined that Plaintiff was unable to work as a finding on an issue reserved to the Commissioner and crediting it "in determining that the claimant's mental symptoms require limitations as set forth above, to decrease the claimant's exposure to stressful situations and other people." Tr. at 21–22. He did not find the state agency medical consultants' opinions to be persuasive, as he determined "the combined effects of the claimant's impairments reasonably limit[ed] her to a restricted range of work at the sedentary level." Tr. at 21. However, in so stating, the ALJ referred only to Plaintiff's degenerative disc disease as "support[ing] the restriction to sedentary work," and failed to reference any other impairment that would be accommodated by the restriction. *See id.* He addressed Dr. Atalla's opinion in discussing Plaintiff's headaches and migraines, finding it partially persuasive in concluding they contributed to Plaintiff's environmental and mental restrictions, but did not prevent all work activity. Tr. at 22. As discussed above, the ALJ considered Dr. Drummond's opinion as to the effects of

idiopathic hypersomnia in limiting Plaintiff's exposure to hazards, heights, and extreme heat. Tr. at 22–23. Thus, the ALJ articulated his consideration of the combined effect of Plaintiff's migraines on her mental impairments, but did not explicitly address how he considered the combined effect of other impairments.

The ALJ's consideration would be sufficient if the record did not contain unresolved evidence that Plaintiff's impairments created additional restrictions when considered in combination. Several of Plaintiff's medical providers suggested Plaintiff's impairments tended to exacerbate other impairments. *See* Tr. at 701 (providing Dr. Tabor's observation that Plaintiff was "of highly anxious nature" and her anxiety "contribute[d] to her pain issues"); Tr. at 733 (indicating Dr. Drummond's impression that Plaintiff's sleep disturbance might be contributing to her headaches); Tr. at 1410 (containing NP Lesieur's statement that Plaintiff's "multiple complex medical co-morbidities have had a profound impact on her mental health, and her disabling mental health condition has caused exacerbation of many of her medical problems"). Despite his statement that he considered the combined effect of Plaintiff's impairments, the ALJ's decision does not reflect his consideration of Drs. Tabor's and Drummond's and NP Lesieur's impressions as to the interaction between Plaintiff's multiple impairments. Given this deficiency, the undersigned recommends the court find the ALJ did not

consider Plaintiff's impairments in combination as required pursuant to 20 C.F.R. § 404.1523(c) and the Fourth Circuit's decision in *Walker*.

### 3. Subjective Allegations

Plaintiff argues the ALJ did not properly evaluate her subjective complaints. [ECF No. 18 at 21]. She maintains the ALJ mischaracterized the evidence as to the care she provided for her son. *Id.* at 22. She contends the ALJ failed to consider all the regulatory criteria pertinent to assessment of her subjective allegations or to address her specific complaints. *Id.*

The Commissioner argues the ALJ followed the regulatory process in evaluating Plaintiff's subjective allegations. [ECF No. 20 at 15]. He maintains the ALJ properly considered Plaintiff's statements as to her ADLs and relief provided by medications, diagnostic studies, physical exam findings, routine treatment, and expert opinion in evaluating her subjective allegations. *Id.* at 15–16.

"[A]n ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). The ALJ proceeds to the second step only if the claimant's impairments could reasonably produce the symptoms she alleges. *Id.* At the

second step, the ALJ must "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)). He is to "evaluate whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at *6 (2016). However, he cannot consider the claimant's symptoms "based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." *Id.* at *4; *see also Arakas*, 983 F.3d at 98 ("We also reiterate the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms.").

In evaluating the limiting effect of a claimant's alleged symptoms, the ALJ is to consider other evidence to include "statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms . . . as well as the factors set forth in [the] regulations." SSR 16-3p, 2016 WL 1119029, at *5; *see also* 20 C.F.R. § 404.1529(c) (listing factors to consider, such as ADLs; the location, duration, frequency, and intensity of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and any other factors concerning an individual's functional limitations and

restrictions due to pain or other symptoms). The ALJ is required to explain which of the claimant's symptoms he found "consistent or inconsistent with the evidence in [the] record and how [his] evaluation of the individual's symptoms led to [his] conclusions." SSR 16-3p, 2016 WL 1119029, at *8. He must evaluate the "individual's symptoms considering all the evidence in his or her record." *Id.*

The ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to cause some of her alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical and other evidence of record. Tr. at 19.

The ALJ's decision reflects his consideration of multiple factors in evaluating Plaintiff's subjective allegations. He noted neurosurgery was not indicated to address Plaintiff's back pain; her primary care provider's recommendation of conservative treatment for an acute exacerbation of back pain; observations that she ambulated without difficulty, had full lumbar ROM, and had no neurological deficits; her failure to follow up with the interdisciplinary pain team; stable MSEs; her inability to continue CBT because she had to focus on providing care for her son; and medical opinions suggesting she retained the ability to perform some work activity. Tr. at 19–22. The ALJ emphasized that Plaintiff's ability to provide daily care to a

young child with special needs undermined her subjective allegations as to the disabling effects of her symptoms, writing:

> Treatment records document the claimant's report that she has difficulty leaving her son alone with her mother-in-law. She admits that she is protective of her son due to his medical condition. On multiple occasions, the claimant indicated that she is a full-time caregiver for her young son (Exhibits 1F, 2F, 6F, and 7F). Childcare, especially for a child with specialized medical needs, can be quite demanding both physically and emotionally, and is not entirely consistent with the claimant's allegations of symptoms so severe as to be disabling.

Tr. at 20.

In *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), the court recognized that "[a]n ALJ may not consider the type of activities a claimant can perform without also considering the extent to which she can perform them." Here, the ALJ did not neglect to consider the extent to which Plaintiff could care for her son. He acknowledged Plaintiff's testimony that her son had "medical needs that require[d] her to monitor his nails, medicate him several times a day, and help him with toileting"; she typically spent her day caring for her son; her "mother-in-law care[d] for her son about 2 to 3 days per week, for about the last 7 months"; she "call[ed] her mother-in-law to take her son when she develop[ed] a migraine and ha[d] to lay down"; and "[s]he [was] home alone with her son from 7:00 am to 6:00 pm most days while her husband work[ed]." Tr. at 18–19. Although the ALJ recited this testimony, he failed to reconcile it with his conclusion that Plaintiff's subjective allegations

79

were not entirely consistent with the record. Plaintiff's allegations pertain, in part, to whether she could remain on task and complete a normal workday and workweek. She testified that she had to call her mother-in-law to pick up her son two to three times a week because she was experiencing migraines, struggling, or in a lot of pain. Tr. at 61, 66. This portion of her testimony arguably supports her allegation that she could not remain on task and complete a normal workday and workweek. Because the ALJ did not reconcile this evidence with his conclusion, his reliance on Plaintiff's ability to care for her young son is not sufficient in and of itself to support his rejection of her subjective allegations. Although the ALJ cited other evidence in support of his rejection of some of Plaintiff's subjective allegations, he did not explain how this evidence was contrary to her allegations that she would be off-task and unable to complete a normal workday. Because the ALJ failed to explain how his evaluation of Plaintiff's symptoms led to his conclusion, he did not comply with the provisions of SSR 16-3p, and his conclusion is not supported by substantial evidence.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the

undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

May 25, 2021
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

81

## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).